Good morning, your honors. My name is Lenore Elbert and I represent the appellant Helen Galope. I'd like to reserve five minutes for rebuttal. I received the court's order and I have looked at the three cases with regard to Article 3 standing and the issue of LIBOR in this case. When you look at Hinojo's case, they clearly said and recited to the case of Mazza that if the borrower either would not have purchased the question or if the product was more expensive, then Article 3 standing would be met because we are talking about the injury in fact prong, which was that issue in the district court. Here we do have the allegation by Ms. Galope, which is in the third amended complaint, which would be at page 684 of the fourth volume of the excerpts of transcript, where she alleged she would have never taken out the loan under the fall cause of action. And then we also had her declaration with regard to the motion for summary judgment, where she had said the same thing that can be found in the record on page 2070. Third, we had an expert, Mr. Motz, who had also declared in his expert capacity that no reasonable consumer would take out a loan knowing that the lender was actually manipulating the LIBOR rate against them on a LIBOR loan. Just as some background, this case was a LIBOR loan case where Ms. Galope and potential others similarly situated received loans during the mid-2000s, and that loan was based on the LIBOR rate. At the time, unbeknownst to the consumers. Well, let me make sure I understand that correctly, because she had started with a fixed rate loan, correct? Her loan was fixed, right, and eventually would then adjust? Yes, it was locked. It's a lock rate. And did she default prior to the end of that lock period? The default did occur before that lock period ended, correct. So with regard to the cases that the court had asked you to discuss, Hinojosa, Mazza, and Maya, those are all false advertising claims, misrepresentation type cases, basically standing for what to me is a very commonsensical proposition that if you pay for something based on a misrepresentation or bought something based on a misrepresentation that you otherwise wouldn't have purchased, then you have a claim, or if you paid more for something based on a misrepresentation or false advertising, then you wouldn't have a claim. But in this case, I'm trying to understand how she was injured if she defaulted before the fixed loan adjusted under LIBOR. Doesn't she have to allege some nexus between the product that she claimed she wouldn't have bought? In other words, if she had a fixed rate and she never ties the LIBOR rate manipulation to her fixed rate loan, then where is the injury there for purposes of Article III standing? Even though it was a fixed rate, it still was a LIBOR loan. The loan was still accruing interest at the LIBOR rate. What she was paying has no relation to what she owed. So although you have these exotic loan products that might have an initial two-year period rate lock like this one did, and it was an interest-only note, her note was still accruing. It was still a LIBOR note. It was still a LIBOR rate note. However, the conjunction here is or. And the conjunction here on standing is whether you pay more or whether you wouldn't have purchased it but for the fact, if you had known whatever that misrepresentation was. And here the misrepresentation was that this loan was based on an independent market rate. This loan was not based on some third independent market rate. It was actually being manipulated by the very lender that was giving them the loan. And this was not a fixed rate loan. It was not on the life of the loan. It was just a rate lock, meaning you will pay the same amount of dollars, allegedly, for the first two years. However, when you look at these exotic loan products, they can actually accelerate within that time period, which then changes what you actually pay in that period of time. And what was interesting about this loan product is that the mortgage-backed securitized trust that this went into was also a Barclays-made trust vehicle. So Barclays not only lent the money and fixed the rate and manipulated the rate, they put it into their own trust, which then they bet against the same homeowners. I'm interested in what kind of relief are you seeking from Barclays? In this one, well, we have the fall cause of action, the UCL, the fraud. And so they each give different relief. First one gives restitution under the UCL in the fall, but the fraud also gives damages. And you also can get, obviously, injunctive relief under the UCL, too. All right. And would you have to give back the money that you would need to tender the principal balance back to Barclays? We never did get to that. The court never ruled on that tender issue in the court below. It would appear here that what would occur if we apply the reasoning, it isn't like buying keys in Kwikset that says made in the USA where you would get just the money back. No one ever gives the home back. But what occurred here was if you take away the manipulation, because we're talking about a long-term investment. You're talking about someone's home. It isn't a product that you would just readily either consume or give back. Everybody wants to keep their homes. But restitution, to put them back in the same place that they would be, would be whatever money that they loaned, they would be put back either into a proper vehicle, which then would be a loan modification, which you've seen a lot of. In other scenarios, the government contrived devices for that, and you've seen other lawsuits where that device has been employed. The reason for my question, I'm concerned about your standing. Right. And whether you would satisfy the redressability requirement. Correct. And then there's a second option. And so there can be this modification of the loan. Or you can, as we've shown, is you could give back the money that was paid. Because when you're looking at a false advertising claim, that's usually what is given in any other type of product scenario. So here we had almost, it was like approximately $100,000 in interest-only payments that was paid towards this rigged LIBOR market interest. Because it didn't go towards the principal of her home. So hers was easy, and most of these are. As a matter of fact, the whole mortgage-backed securitized trust in this case was set up to have an interest only until 2012. And we know the rigging ended around 2009. So for everybody, it would be the same. It would be that same mortgage interest rate. Because most of these people were foreclosed upon. A lot of them, you only had in this trust approximately 15% of the homeowners that could even sustain this type of exotic vehicle. This trust was truly set up to fail. The LIBOR, the market rigging was set up purposefully to only make money for the banks. And they made it on every single side in this case. There was no way that the average homeowner could succeed no matter what they did in this loan. Even if you were going to pay your interest rate under these types of vehicles, you would still default. So the loan was created, this mortgage-backed securitized trust was created to default. How the 15% survived, it's just more of an anomaly than what would be expected. Can you talk about your claim based on violation of the automatic stay? And before you answer that, clarify for me which defendants you're going against with regard to those claims and whether there was notice. There's evidence in the record of notice that there was an automatic stay in place. With regard to the claim of violating the automatic stay, that goes to Western Progressive. The trustee and Aquin, who is the current servicer, both of them had notice through the bankruptcy court that there was a bankruptcy petition filed. During that course, the bankruptcy court dismissed it for lack of filing something. The debtor was able to get that bankruptcy stay reinstated before the sale. There was a courtesy notice that was filed by the bank's attorneys themselves, so they received notice as soon as that vacate order came through, which was a few days before the actual day of the sale. Then the debtor, as alleged, had also given notice after she learned of the sale that the bankruptcy stay was, the bankruptcy was back in place and that they had violated the stay. Yet the bank continued to hold on to the title and refused to give the title back. Neither the servicer, Aquin, nor Western Progressive would give the title back until after this case was filed. And the court found it to be moot because once they were facing the TRO and possible preliminary injunction, they decided that they sent in a declaration that the banks were going to go ahead and give title back to Ms. Galop. My point is that standing occurs at the date that the lawsuit is filed. If you do that, then most defendants could moot out almost every single action. It's an involuntary settlement, and there's some case law that is cited in the brief with that proposition. And here, at the time the lawsuit was filed, she still did not have title to her home. She was entitled, since she went that route, to receive damages that she incurred because she still incurred attorney's fees, she still incurred other costs and other time and expense. And her title was clouded for, it was like six to, I believe it was almost six months, maybe nine months. And where she couldn't use her equity, she couldn't use her home, she couldn't use it for any credit purposes. And so there was a real damage there. Back to the standing, under the three cases, it shouldn't make a difference because this is a long-term loan. I know it's different because it is a long-term loan. But because the injury is, it's actually more severe. Because it's so injurious doesn't mean now you lack standing. It should mean now there is some redressability here. It isn't like a political question. Usually when you're talking about Article III standing, you're asking, am I usurping another branch of the government? And I get it that all courts are struggling with the concept in this foreclosure crisis, what kind of damages, because the damages seem like they're so large. But yes, they are. And we're seeing settlements like that all the time. We're seeing settlements in the billions of dollars. And even with these billions of dollars of settlements, the economic reality is the financial institutions have grown enormously during this period. It's only a portion of their profits that they're even losing in these settlements. So although damages are enormous, they're justified. There is redressability here. Did you want to save about three minutes for rebuttal? Thank you. Okay. Good morning, Your Honors. May it please the Court. My name is Matthew Papora of Sullivan and Cromwell, appearing on behalf of the Barclays appellees. Your Honors, I've consulted with counsel for the other appellees and agreed to split our time in half. So I'll be taking seven and a half minutes, and then counsel for the other appellees will round out the argument. Your Honors, in a well-reasoned decision, the district court dismissed each of the appellant's six claims against the Barclays appellees, and it did so for several reasons. Most fundamentally, though, it dismissed because the appellant has failed to adequately allege that she suffered any injury whatsoever as a result of the conduct she alleges against the Barclays appellees. Well, what about the case of Maya v. Sintex? Doesn't she allege and declare that but for Barclays' failure to disclose its ability to manipulate LIBOR, she would have done business with somebody else? She does allege that, Your Honor. Let me draw a distinction between Maya and the other cases that this Court brought to the attention of the parties, the Maza case and the Anojos case. In each of those three cases, the plaintiff had adequately alleged, number one, that he or they were induced into entering into transactions as a direct result of misrepresentations made by the defendant to the plaintiff. That induced the plaintiff to enter into the transaction. The plaintiff also adequately alleged that by entering into that transaction, they were injured at the moment they entered into the contract. They suffered a real injury, in fact. In Maya, for instance, they paid more for the homes than those homes were worth because they believed they were paying for homes that actually were in stable neighborhoods. Neither of those two circumstances, the inducement by the defendant or injury, in fact, are present here, Your Honors. And I'll explain why. Well, she signed her name to a, she committed herself to a long-term note. She did, Your Honor. I mean, having done that, why isn't that injury, economic injury? Well, Your Honor. She said she wouldn't have done it had she known. You're correct, Your Honor. But number one, with regard to her saying that she wouldn't have engaged in the loan transaction, she didn't transact with either of the Barclays appellees. She transacted with New Home Century, New Mortgage Corporation, Your Honors. And that's expressly alleged in paragraph 15 of the third amended complaint, the complaint that the district court properly dismissed. She expressly alleges that she purchased the loan from New Century, that New Century was the seller of the loan, that it sold her the loan. The only entity that could have made any representations that would have induced her to enter into that transaction was New Century. And she doesn't allege that New Century made any such allegations. Now, getting back to your question, Judge Pides, about whether there was actually any injury, regardless of the fact that any misrepresentation could not have been made by a Barclays appellee, this appellant did not suffer injury when she entered into the loan. As Judge Wynn pointed out previously, this was a loan that employed a fixed interest rate on the front end. It was undeniably a fixed interest rate of 8.775%. She contracted to get that fixed interest rate. She got that fixed interest rate. Now, she contracted also to get a loan that would, at some point in the future, January 1, 2009, to be precise, would switch from a fixed interest rate loan to a floating interest rate loan that would be calculated in accordance with LIBOR. But, Your Honors, any claim that she would have been injured if and when the loan actually did link to LIBOR, if she had not defaulted on her payments, any allegation that she would have been injured is absolutely speculative and hypothetical. There's nothing in the complaint that suggests that she would have suffered injury if and when that loan did link to LIBOR. Your Honors, each one of the three cases, the Maya case, the Mazza case, and the Anojos case, rely on similar facts. They all require that there be a misrepresentation from the defendant to the plaintiff, inducing the plaintiff to enter into the transaction. That didn't occur here. They all require that the plaintiff allege adequately that he suffered an injury in fact. That did not occur here. Barkley stepped in as a servicer, right? Yes, Your Honor. Barkley stepped in as a servicer actually months after the appellant even entered into the loan. It's undisputable, Your Honors, from the allegations of the complaint and also from the loan documentation submitted by the appellant that Was it known at the time of the transaction that Barkley was going to be the servicer? The record's not clear on that, and certainly the appellant doesn't allege it. The appellant alleges that she entered into the loan with New Century and that months later, in April of 2007, Barkley took over as the servicer. In any event, the Barkley's appellee that took over as servicer was Home Ex Servicing, and Home Ex Servicing is a corporate affiliate of Barkley's Capital Real Estate Incorporated. That entity does not sit on the dollar LIBOR panel, on any LIBOR panel. It's not responsible for making LIBOR submissions. To the extent that the appellant is making any suggestion whatsoever that Home Ex Servicing could have made a representation, there's nothing in the complaint that suggests that Home Ex Servicing would have had any knowledge whatsoever about any LIBOR manipulation, and it's well-established under black-letter law that you cannot impute the knowledge of a parent company to a subsidiary merely because of the corporate form. There's nothing in the allegation that suggests, even if she had alleged that Home Ex made any representations whatsoever, that it would have done so in a knowingly false manner. Your Honors, going back to the reasons that the district court correctly dismissed the claim, the appellant has not alleged that she ever made a single payment based on LIBOR. Again, a review of the appellant's own allegations and the loan agreements show unequivocally that she made only fixed interest rate payments, both on the December 2006 loan and also on the modified 2008 loan. It is also undisputed that the appellant defaulted on each of those loans long before they were set to recalculate in accordance with LIBOR. Again, to the extent that there's any suggestion whatsoever that this appellant could have suffered any kind of injury as a result of LIBOR manipulation, that can't be. It's not a factual possibility. And therefore, the district court correctly determined she has neither Article III nor statutory standing to bring her claims. There's a separate set of allegations that I'll refer to as the fact scheme allegations that the appellant presents. And those allegations essentially boil down to a simple claim that Home Ex Servicing, in April of 2008, faxed the appellant a copy of the modified loan agreement and did so in a purposely misleading way so as to obfuscate certain terms on the agreement. I think the common sense way to put this is the appellant alleges that when the fax was transmitted through, the bottom three inches was lopped off of the one or two of the pages of the agreement. The appellant alleges that as a result of that, she was falsely led into believing that she was achieving terms that were more favorable than those that were employed by the initial loan agreement. But, Your Honors, that is precisely what happened. By entering into the modified loan agreement, the appellant was materially benefited. She most certainly did not suffer any injury whatsoever. She achieved a significantly decreased monthly interest rate. It went down from 8.775% to 5.5%, and that immediately translated into roughly $800 of savings on her monthly loans. In addition to that, as the appellant herself alleges in paragraph 54 of the Third Amendment complaint, by entering into the modified loan agreement, she staved off foreclosure. She herself expressly states that she cured the then existing default on her December 2006 loan by entering into the modified loan agreement. In short, Your Honors, there's nothing that the appellant alleges that establishes any injury in fact. She does not have Article III nor statutory standing to bring any of her claims against the Barclays appellees, and we would ask that the district court affirm. Sorry, that this court affirm the district court's decision. Thank you. Let's see who's next. Good morning. May it please the court. My name is Robert Norman. I represent the defendants, Deutsche Bank National Trust Company as trustee, Auckland Loan Servicing, and Western Progressive. Your Honors, I do want to avoid some of the overlap because we share a lot of the arguments with Barclays. But there's a few important distinctions that I would like to make in focusing on the LIBOR standing claims. With, in particular, Deutsche Bank National Trust Company, or DBNTC, that entity, like the Holmec Servicing entity, was not a LIBOR company that sat on the panel submitting rates. That's Deutsche Bank AG, a separate legal entity organized under the Republic of Germany, who was never a party to this case. So I think that's an important distinction to make for Deutsche Bank National Trust Company. Focusing on the injury in fact, again, there are some similarities, but as Judge Nguyen pointed out, the original loan was not tied to LIBOR. I mean, this was a fixed rate from New Century, another entity not before this court. There's an allegation that she would not have obtained this loan, but there has to be a misrepresentation from the defendant appellees, I believe, to rely on, let's say, the Hinojo, Smaza, or Maya cases, and that didn't happen in this case. With respect to the causation type argument under Article 3, and could this injury be traceable to any of the challenged conduct? Again, there's some overlap with the fact that there was no actual injury, and that there could be no causation because Deutsche Bank National Trust Company was not on the LIBOR panel. Deutsche Bank National Trust Company, there's no evidence, there's no allegations that that entity ever made a single allegation to Ms. Globe. And that makes sense, because they were a trustee for a trust. Communications are going to start with either your original lender, which in this case was New Century, and then eventually transition to perhaps a loan servicer, that's the way the industry is set up. So there would have been no communications or a link to show some sort of causation. With regard to the violation of the automatic stay, can you tell us why it took so long for the sale to be rescinded? Yes, Your Honor, there's a few reasons. Number one, and I think the opening brief was a little misleading in that there wasn't this notice to Western Progressive, who's the foreclosure trustee. And what had happened in this case is when the second bankruptcy was filed, it was dismissed shortly thereafter because the proper schedules weren't filed. Ms. Globe moved to reinstate that. That happens on August 30th. There's an allegation that notice was provided to other entities, but not the foreclosure trustee, Western Progressive. And that's the, in the record, the declaration from Ms. Spurlock indicates that they had not received notice that the bankruptcy had been reinstated. Did Auquin get notice? There's an allegation that notice was provided to counsel for Auquin, but still not to the foreclosure trustee. But I think what was more important for the district court's reasoning is that the sale was rescinded. And the other fact that's a little bit unique, and when you have to look at it from the industry's perspective, after the foreclosure sale- That may eliminate the need for injunctive and declaratory relief, but that doesn't eliminate her claim for damages. But her claim for damages, Your Honor, was under wrongful foreclosure. And as the district court looked at- Well, it's essentially, what she's essentially claiming is a violation of the automatic stay, which results in the wrongful foreclosure. That's the core of her claim. Your Honor, I would think that the difference here is that she did not allege a violation of the automatic stay as a borrower or a debtor could have done so. And then I think that changes- Well, she essentially, I mean, you don't have to use all these fancy labels. If you look at the factual allegations, she alleges there was a violation of the automatic stay, which resulted in improper foreclosure. Well, I believe the way the district court had focused its analysis was that it was a wrongful foreclosure claim. Well, it's styled as a wrongful foreclosure claim, but all of the allegations focus on the violation of the automatic stay. So I think it's a fair construction of the claim that the claim is based on an allegation that there was a violation of the automatic stay, which could give rise to a claim for damages. And I don't see how the damages claim really goes away, given those allegations. So what evidence would contravene that claim for damages? Well, Ms. Galop had an opportunity at the trial court to oppose a summary judgment to bring forth evidence of damages. And I don't believe that she did that. I believe that the focus that was there was that there was no equity in the property, so there could not have been any damages. And that because the sale- Well, she's not just limited to equity in the property as the only basis for damages. I think under a pure 362 violation, I think there could be other damages. There could be emotional distress, potentially- Correct. Other claims. But I just don't think that was the way it was fashioned before the trial court. That's not how it was pledged. And this was her third amended complaint. I mean, if she wanted to allege a specific claim for violations- I can't remember. There were so many. We're dealing with so many claims here. I can't remember. Was this claim knocked out on summary judgment or on a motion to dismiss? All of the claims, Your Honor, for my client, Deutsche Bank National Trust Company, AQUIN, and Western Progressive were done on summary judgment. Yeah. Where she had to come forward with the evidence to create the tribal issue, and the district court didn't find that she did so. She was seeking attorney's fees also, was she not? She was generally seeking attorney's fees, but there wasn't a showing. I think, again, the court focused here that it didn't view this in the scope of a 362 claim, and I appreciate the court saying that that was sort of the genesis of why wrongful foreclosure, but she didn't couch it as a violation of 362. It was a wrongful foreclosure claim, and her other claims against my clients wouldn't allow for damages. Excuse me. Attorney's fees. For example, the UCL claims. I mean, that's a restitution-based remedy where she's not going to get attorney's fees. Thank you. Your Honor, just to conclude, on the fraudulent inducement, excuse me, on the redressability by an order, Judge Nelson, you asked about that, and I think that there would be a problem here, back to the standing argument, because what would there be to redress where none of the appellees were involved in making the communications to Ms. Galop, which was the exact opposite in the Hinojosa, Maza, and Maya, that there were those representations, the direct involvement. Here, there's just not that connection, that nexus, so I don't know what the redressability would be. Your Honor, I have nothing further unless there's any other questions. Nothing further. Thank you. Okay. You have a few minutes for rebuttal. Thank you, Your Honors. With regard to New Century Mortgage, they were considered a loan sender. They were never alleged to be a lender. They're not a lender. They're listed in the Mortgage Back Securitized Trust. They're in the record. The panel can judicially recognize that fact. Say that again. They were a what? They were a loan seller, not a lender. A loan seller is someone that- Well, is it clear that they were selling on behalf of Barclays? Yes, they are listed in the Mortgage Back Securitized Trust as one of their loan sellers, one of the people that would be peddling their loans, rather than a bank. Traditionally, banks used to have their own desks and their own sellers inside their banks. Well, so they make a distinction between Barclays, I forget what they called it, the local one as opposed to the Barclays that sat on the LIBOR panel. There's a Deutsche Bank in America, Barclays in America, and then there's a Deutsche Bank in Germany and a Deutsche Bank in England. They're just subsidiaries of each other. Although they're subsidiaries and affiliates, they're still agents of each other. They just have different units. When the LIBOR scandal broke, we had 16 banks, at least 16 banks, approximately, that make up the LIBOR loan. That would be Deutsche Bank AG and Barclays, PLC, London, and Germany. They have subsidiaries, so they have all their little financial institutions spread out throughout the world. What they're saying is that they're trying to break the nexus between their subsidiaries and between Barclays proper. Now, Barclays, PLC, and London is the same Barclays in this mortgage-backed securitized trust. Deutsche Bank National Trust Company, Deutsche Bank Trust Companies of Americas, are the two American-created entities of actually the subsidiaries of Deutsche Bank in Germany. But that doesn't cut off the nexus. That would be like saying, for example, in the other case, somehow you have a subsidiary of a Ford Motor Company or GM and Chrysler. You don't cut off from each other unless if there's some legal reason to do so, and there wouldn't be in this case. But New Century is listed in the mortgage-backed securitized trust. They're a loan seller. They're just a seller for that loan pool. So you would have New Century Mortgage or a couple other peddlers on the papers, but it doesn't mean that it wasn't representation made by the people in that mortgage-backed securitized trust. That's the whole point of these trusts. As far as the faxing goes, there were damages because the material term was anything past a certain year was not disclosed in the bottom three inches. And therefore, she stopped paying after advice of counsel to stop paying, because they weren't giving her all the material terms of her loan modification, which resulted in the second default. And then finally, on the automatic stay, there was a declaration from page 2067 to 70 where she does allege her damages. So the damages were in the record for the court with regard to the type of damages that resulted with regard to the automatic stay and everything else. But going back to standing, this is redressable. It is redressable. Barclays is getting away with this whole libel rigging across the board. This is the last stand. These are the direct purchasers. If the direct purchasers don't have standing, then who does? And we see the kind of financial crisis and the greed that occurred here, and how the rest of the economy and everyone else has to live with it. And if there's something technical, it's just a technical pleading error. If you need to plead that New Century Mortgage is an agent of Barclays, that can be pled, and it can be proven through the own mortgage-backed securitized trust agreements. Thank you, Your Honors. Thank you, Counsel. We appreciate your arguments in this interesting case. And the matter is submitted, and that will end our session for today.
judges: Nelson, Paez, Nguyen